The next and final case this morning is 18-1366, United States v. Muhtorov. Counsel, I would prefer to hear your argument. Thank you. I will incorporate the same remarks I made as to the panel's decision to delay the broadcast of the information of this argument. You may proceed, counsel. Good morning, Your Honors, and may it please the court. I'm Patrick Toomey, representing Appellant Jamshid Muhtorov. We've raised four issues in this appeal. The first is the government's warrantless surveillance of Mr. Muhtorov's email. That's where I'll start today and then say a few words about the other issues. Mr. Muhtorov was the first person ever to receive notice of Section 702 surveillance. This surveillance presents a set of novel issues. That's only become clearer as courts have learned more about how the surveillance is turned back on Americans. I'd like to focus on three points at the outset today. First, I'd like to explain the fundamental problem with this surveillance. It allows agents across the government to read and sift through the emails of Americans, including Mr. Muhtorov here, without ever getting any kind of individualized judicial approval. Second, I'd like to explain why this surveillance violated the Fourth Amendment, especially in light of the government's backdoor searches. And third, I want to explain one way the court can resolve this challenge narrowly, by requiring stronger safeguards for Americans as part of minimization. Counsel, as you elaborate on those arguments, one thing that would, I think, be helpful is if you could distinguish between making a facial challenge to the 702 process as opposed to an as-applied challenge relative to your client. I found it challenging to sort through that in your brief and in the district court's treatment of the issue. And I understand you're bringing both facial and as-applied challenges. I'm particularly interested in the as-applied, and you're speaking more directly to that. Of course, Your Honor. Now, I think that, in some ways, this issue is blurred in the context of electronic surveillance. And that's because when courts review electronic surveillance regimes, going back to the Supreme Court's decision in the Berger wiretapping case, they consider not only the scope of the intrusion at the outset, but also the procedures that govern how the government is allowed to exploit the private information that it collects in the course of the surveillance. And that's because courts, since the Supreme Court in Berger, have acknowledged the inherent dangers and inherent overbreadth into privacy that electronic surveillance poses. And so courts, beginning with Berger, continuing with this court's analysis of video surveillance in the Mesa-Rincon case, with the federal appellate court's consideration of traditional FISA and its procedures, and the FISA Court of Review's analysis of surveillance under the Protect America Act, all of those courts look to the information that it collects in the course of the surveillance. And we believe the court here has to follow the same analysis. The Fourth Amendment analysis requires courts to consider the totality of the circumstances. And when it comes to the amount of information that these new technologies and that electronic surveillance puts into the hands of the government, the procedures that control how agents are allowed to use, disseminate, retain, and query that information bears on the scope of the intrusion. And here, the procedures, I want to be clear, are very permissive. The government says that the procedures are good enough to protect the bedrock Fourth Amendment interests of Americans. But when you look closely, they are weak by design. They allow the government to retain the communications it collects under Section 702 for five years by default. And so, this is one of the practical things I really want the court to, I hope the court understands. And that is that the agents in general are not reviewing these communications at the moment that they are acquired in order to filter out or to minimize Americans' communications. Instead, the communications are automatically amassed in the government's databases and then can be reviewed or queried after the fact for up to five years. And even when it comes to Americans' communications, they can be reviewed or queried for virtually any investigative purpose, for intelligence purposes or purposes of ordinary criminal investigations. And in that way, the procedures permit the government to conduct exactly the type of intrusion into protected communications that the Fourth Amendment is requiring. Let's consider the gathering of information, the seizure. The search is when the government turns to that information and starts probing for discrete and particularized information. If that is roughly correct, what requirements are there under the statute for the probing part of it or the search aspect of it? What the minimization procedures require based on diversions of those procedures that are public, and I want to emphasize the defense here has never seen the procedures that apply to the Section 702 Surveillance of Mr. Muterov. But the publicly available procedures indicate that agents can examine these communications when they are reasonably seeking foreign intelligence information or evidence of criminal activity. So, for any of those broad investigative purposes, including the investigation of domestic criminal offenses. So, it's not limited to national security. It's not limited to terrorism. In fact, agents query these databases. The FISA court reported in its opinion in 2018, more than 3 million times a year. And one government lawyer in a FISA court proceeding referred to these database searches as the FBI's Google. And just to give you a sense of how frequently these searches are conducted. And the FISA court in that same opinion not only noted, but rested in its decision in part on the fact that when FBI conducted those queries, including of Americans, they were not even required to write down the justification or the reason for their query. Council, just to put things in context, it seems like it would be helpful to recognize the steps, the key steps in the Section 702 area. And as I understand it, maybe you can break it down in different ways. But the first step is the Attorney General, Director of National Intelligence proposes the procedures to the Foreign Intelligence Surveillance Court. Step one. Step two, the FISC reviews that collection step where the intelligence agency conducts surveillance of targeted individuals. And then step four is the querying step. Is that okay so far? Have I described that properly? I think so, Your Honor. There are different ways that agents can explore or review the methods. All right. My question, though, is if the steps break down that way, it seems like you're jumping to step four, the querying, but you're not addressing anything up until then. Am I misunderstanding your argument? I just like to have this a little bit better in context. Yes. So our challenge is not... Our challenge is not confined to step four. And our challenge is to the surveillance of Mr. Mural's communications. So that includes the collection, the retention, the use, and the querying of those communications. And I want to help, Your Honor, understand why that's the case. And it's because when courts are evaluating an intrusion in the context of electronic surveillance, the court analyzes the lawfulness of the collection, that first step, based on how the government is permitted to exploit the communications, that private information, at later steps. And so when a court has to evaluate, was this collection lawful in the first instance, it looks to the procedures that constrain the government's use of that information down the line. And so part of our argument here is that the collection of Mr. Mural's communications was ultimately unlawful because the safeguards that were in place in terms of how the government would later review them, query them, retain them, were not sufficiently protective of his Fourth Amendment interests. Well, but doesn't that basically conflate the entire inquiry to a querying inquiry? It seems to me that that almost concedes that the collection of how many millions or billions of pieces of communication? Our understanding is that billions of communications are collected. Billions. All right. So billions. So it seems to me you almost concede that the collection of billions of pieces of information is okay. Absolutely not, Your Honor. Our position is that the collection of these communications, to the extent that it encompasses the communications of Americans, which it certainly does as the Privacy and Civil Liberties Oversight Board has observed, as the FISA Court has observed, that the collection of Americans' communications under this regime, which, of course, are protected by the Fourth Amendment, as even the government concedes, that when those communications are collected without sufficiently strong safeguards, that the collection itself is tainted. And what we have argued in our brief is that to the extent the government says, well, we don't always know in advance whether we're going to sweep up some address through stronger minimization procedures, when the government knows that it has encountered an American's communication or that it is querying an American's communications, at that point in the process, it can seek the type of judicial approval that the Fourth Amendment has consistently required for an intrusion on an American's private communications. So, Mr. Toomey, let me be a little bit more specific. The Circuit Courts in Mohammed and Hazbaz Rami both recognized an incidental overhear doctrine. Is that accurate? Yes, they did, Your Honor. All right. So why shouldn't we do the same thing here? The courts in those cases made two mistakes when it came to the incidental overhear doctrine, at least two mistakes, Your Honor. The first is that the all involved warrants. So the government in those cases had a warrant at the outset, and what that warrant did was it ensured that the privacy of both the individuals identified in the original wiretapping application and others who were overheard were protected. The warrant, of course, is the Fourth Amendment gold standard. And when the government has a warrant, it authorizes it to intrude on Americans' protected communications in search of evidence for a particular crime. In this case, the government has no warrant. In fact, what it points to to justify the surveillance in the first instance is the fact that its foreign targets have no Fourth Amendment rights whatsoever in its view. And the absence of any Fourth Amendment justification that would satisfy Americans' protected interests makes this case very different from that one. It's not just the government arguing that. There is case authority from the Supreme Court on the surveillance of non-Americans, isn't there? So the Supreme Court in Virdugo certainly dealt with the rights of someone whose home was searched abroad, but that case dealt only with the rights of non-U.S. persons. And Justice Kennedy in his concurrence in that case was very clear that if the search had taken place in the United States and if it had implicated the rights of a U.S. person, that the analysis would be very different. I want to come back, though, to the incidental overheard cases for a moment, though, Your Honor, because the second thing that those cases said or that the two other courts said in addressing this issue was that it doesn't matter why the government's intrusion was lawful in the first place. And that is in conflict with Supreme Court precedent in cases that involve exceptions to the warrant requirement. So, for instance, the Supreme Court's decision in Riley where it dealt with seizures of cell phones, incident to arrest. The court there was very clear that the reason for the government's intrusion, the reason that the government was bypassing the warrant requirement in the first instance mattered and that it limited the extent of the government's intrusion into all of the private data on that cell phone. So the Supreme Court has said similar things in Terry when it talked about searches there, in Rodriguez in considering when a traffic stop may escalate into a dog sniff, and in Ferguson when it talked about the special needs searches that were drug tests that were conducted there. So when the government is relying on an exception to the warrant requirement, as it's certainly doing here, it matters what its justification is. And the justification here is that its targets don't have Fourth Amendment rights. Now, just a quick follow-up, then. In Hospash Rami, the court referred to both incidental collection and inadvertent collection. Do you contend that there's any issue in this case about inadvertent collection? Not that we know of, Your Honor, but I want to be clear that we have very few facts related to how the surveillance was conducted in terms of how the government came to obtain the communications that it relied on of Mr. Muderov. So I'm not even sure that the defense in Hospash Rami was aware of that issue prior to the court's decision. But regardless, we don't have a reason to think that's the case here, but Your Honors are far more familiar with the factual record related to the surveillance than the defenses, unfortunately. And to the extent that there are facts that present significant issues, we would ask the court to provide access to the defense. If the government is arguing that in the classified record that some version of the plain view doctrine would justify its intrusion on Mr. Muderov's communications, that's something we haven't ever had an opportunity to challenge. And we would ask that the court permit us to brief those issues if the court identifies them. So if I may, Your Honor, I want to come back to one important point about how the court can resolve this case narrowly if it wants to. Because one way for the court to find that the surveillance of Mr. Muderov was unlawful is to look to the FISA court's opinion in 2018 and the flaws that rendered the section 702 surveillance in that court's analysis unreasonable. There, the court identified a number of flaws in the FBI's procedures that amounted to rendering the surveillance there unreasonable. And one of the factors that the court identified was the lack of reasons for querying an American's communications in the government's database. And similarly here, the court can point to flaws, to weaknesses in the minimization regime as a basis for finding the surveillance unreasonable. And it can then leave to the government the task of proposing and obtaining FISA court approval of strengthened minimization procedures to continue to conduct the surveillance going forward. And I want to emphasize that a ruling like that would not bring the collection to a halt, but it would find that Americans are entitled to greater protections when the government shifts from its investigation of the foreign targets, which it uses to justify the surveillance, to intruding on the communications of Americans, when it knows that it has encountered an American's communications, or when... But not so quick. How is the government to know that if the querying hasn't taken place? It seems to me that what you're arguing is that if there is surveillance of a non-US citizen abroad, that what we should do is limit our opinion somehow to those cases in which the surveillance either through inadvertence or non-intent picks up conversations of an American citizen or information regarding an American citizen in the United States. But that information isn't known by the government or anyone else until the data is queried. And so I don't understand your point. You're asking us to make a distinction on the basis that it's a non-fact. It hasn't occurred. Respectfully, Your Honor, I think that in many instances, the government will know when it has encountered or is seeking to query an American's communications. Well, that's an entirely different matter. The querying, I agree with you, is more akin to a search. At that point, either the government or the court stepping in on behalf of the defense have to determine whether the search has been conducted under some kind of a non-US principle. But you're presuming that we know that at the time the search has commenced, which I think is just, there's no basis on the record that I've reviewed to conclude that that is possible. I'm sorry, Your Honor. I may not have been clear. We believe that the protections for Americans can be applied at the point when the government knows that it has or seeks to query an American's communication. That's the point at which we think, and I want to draw an analogy, because I think this court, especially the Tenth Circuit, has developed some very analogous law in the hard drive search context. So when agents have permission to seize and then search a hard drive for evidence of one particular crime, and they then encounter evidence of a different crime, what this court has said is that the agents at that stage have to pause and have to obtain new authority, new judicial authority, to search further for evidence of that second offense. And I believe Judge I, the Colorado Supreme Court, in the Herrera case, adopted a similar approach. And that's in essence what we're proposing here. The government may be able to conduct the surveillance at the outset if it believes that only a foreigner's communications are swept up. Now, I want to caution. There may be cases where they're tapping a phone line, and they can see quite well that there's an American on one end of the phone line and a foreigner on the other. But in other contexts, they may not always know in advance. But our point is that when the government does know that an American's Fourth Amendment interest, their bedrock protection of their papers and effects, is at stake, that at that point in the process, the government should have to obtain some further authority to intrude on an American's communications. And I want to emphasize the court doesn't have to resolve all of the details of this framework itself. The Supreme Court in Berger, when it analyzed the wiretapping in that case, the Supreme Court in Keith, when it analyzed domestic intelligence gathering, did not, you know, the Supreme Court in Berger, it didn't write Title III. It left to Congress the task of drafting a wiretapping regime that would satisfy constitutional minimums. In the same way here, the court can look to the government to propose a new set of strengthened minimization procedures that would accommodate these Fourth Amendment interests properly going forward. But what matters for Mr. Muterov is that the surveillance that the government conducted of his communications in 2011 was done under a framework that did not have any of these even minimal protections. The agents didn't even have to write down the reasons for their queries. They were allowed to freely review American's communications for virtually any investigative purpose. And the fact that those safeguards are so lacking, even when the government is well aware that it's looking at an American's communications, or seeking to extract all of an American's communications through a database query, is what renders the surveillance of Mr. Muterov in 2011 unreasonable. So, counsel, let me shift gears for just a minute. And I'd like to ask you about your Article III separation of powers argument. Why isn't the Fisk Court performing more of a judicial function in pre-clearing 702 procedures than, say, the Sentencing Commission does in promulgating sentencing guidelines under MISTRATA? So, the problem here, Your Honor, is that the court is being asked to issue advisory judicial opinions in the absence of any factual dispute, or even any factual elaboration about how the surveillance will impact individual Americans, or with any factual basis to show that the intrusion on an American's communications is justified under the Fourth Amendment. And that's very different from the types of traditional FISA proceedings that the government has pointed to in any procedure. Well, counsel, I didn't ask you about that. How do you square your position relative to the MISTRATA decision? The MISTRATA decision, as I understand it, Your Honor, was about the function that the judges were playing in their role on the Sentencing Commission. And here, we're not challenging, we're not saying the judges are not, are playing, are essentially taking on some other role. We're saying that they are issuing the types of opinions that Article III does not allow, which is advisory opinions issued in the absence of a genuine case or controversy. Well, wouldn't it be more constitutionally problematic if the statute authorized Section 702 surveillance with no judicial oversight at all? It might be more constitutionally problematic, but this goes back to the government's Fourth Amendment defense of the surveillance, because it relies on the is reasonable. What we think the answer is, is not to have no court involved in Section 702 surveillance, but to have courts involved in evaluating the intrusion in concrete, specific instances on Americans' communication. Let me just ask, if we agree with your Article III argument, what's the remedy? I think the remedy is to strengthen the safeguards in the way that we... No, no, no. The remedy in this particular case, what would happen if we agree with you on your separation of powers argument? The surveillance would be deemed unlawful just as if the court found a Fourth Amendment violation, and then it would analyze what evidence had to be suppressed as a result of that. Would the good faith exception apply to the Article III error? The good faith exception would not apply, Your Honor, because FISA contains a mandatory suppression remedy in Section 1806G. Oh, but that has to do with the statute, doesn't it? Your argument here isn't about that. Your argument is about Article III. Our position, Your Honor, is that the statutory suppression remedy encompasses constitutional violations. It doesn't only require suppression in instances where the statute is violated, but it also mandates suppression if the surveillance violates the Fourth Amendment or violates any other provision of the Constitution, including Article III. Does the FISA court review only the collection, or in this case in particular, did the FISA court participate in the querying process regarding this defendant? Your Honor, as far as we know, the FISA court had no involvement in any of the review or querying of our client's communications. I'd like to reserve the remaining time if I can, but of course I'm happy to answer whatever questions the court has. Are you ready to address a speedy trial question? I will do my very best, Your Honor. All right, here it comes. Under what authority can we consider Mr. Muterov's pro se speedy trial motions that were filed and stricken in 2017 and also his pro se 2241 application in 2015? Is that relevant to our analysis of the speedy trial issue? And do you have any authority for your answer? I'm afraid I don't have guidance for the court on that point, but we would be happy to address it in a letter if the court would like. If you think it would be helpful, that would be fine with me. You may file such a letter. Thank you, Your Honor. If it's okay, may I reserve a couple of minutes? Of course, it's a given. You may have additional time if necessary. Thank you. Thank you, Your Honor. We'll hear from the government. Good morning, and may it please the court. I'm Joseph Palmer from the Justice Department. Thank you. Counsel, I'd like to follow up where we were before. Assuming the FISA court has passed on the issue of the collection of information in this case, and that we are here only to inquire about the propriety of the inquiry, is it correct that the FISA court has indeed blessed the collection of the data, basic data involved in this case? The FISA court has approved the procedures under which the government conducted the Section 702 collection in this case, and the procedures that govern the government's treatment of the information that was obtained. Thank you. Now, with respect to the querying, what role, if any, has the FISA court played in that regard? Any? The FISA court has approved the procedures that governed the querying that occurred. Those specific procedures at issue in the case are in the classified record, but the description, there are publicly available minimization procedures and descriptions of how those procedures function that we would invite the court in this public setting to consider, including in the report of the Privacy and Civil Liberties Oversight Board. And that report explains essentially that the government's queries are required to be likely to return foreign intelligence information, or in the case of the FBI, evidence of a crime. And those, the FISA court has held that queries according to that, under that standard and that comply with that, with those standards are reasonable under the Fourth Amendment. And are we bound, what cases are there for the proposition that we are bound by those determinations? We're not contending here that those precedential way, but the court should be able to see from the FISA court's cases that the court subjects those procedures to exacting review. And it considers not only the procedures as written, but in the way in which they're actually implemented. And it has before it substantial information about how the government actually implements Section 702. And it continually receives updates. And it's in light of all that information that it has, we think that in the context of this case, the court should focus not on the general facial validity of the procedures, but instead focus on how those, the specific searches that took place in this case, that resulted in the evidence that was used in this case, whether those searches were reasonable. Thank you. In the Ninth Circuit, in a very similar case, followed that approach. It considered, it rejected broad challenges to Section 702 and instead focused on the particular search that produced the evidence against the defendant in that case. And it found that that collection was reasonable without reaching broader questions that were not necessary to resolve the case. And we think that the court should follow that same procedure in this case. How does the Second Circuit's decision contrast with that decision? Well, I think the Second Circuit's decision is consistent with it in that the Second Circuit did consider, did find that the incidental collection of the communications and their use in traditional FISA orders was reasonable in that case. And the Second Circuit, though it determined that the record as regards any potential querying that may have occurred in that case was insufficient and remanded. So it was remanded to the trial court to make that determination? Yes. What assurance do we have on this record that the query, there was oversight, procedural oversight to the querying of the data that was used in the trial of this case, or that was produced in discovery? The classified record in this case includes the government's declarations regarding its good faith compliance with the minimization procedures. I am privy to that information. I could find no specifics in the classified record conducted at my request that allow me to conclude one way or another whether there was a procedural or procedural protections with respect to these querying, with respect to the querying that was done here. Other than these general statements that you refer to, will the classified record be augmented so that we can make that determination? Or do we need to also remand for that determination to be made below? We're certainly prepared to supplement the record if the court were to direct that. But our position is that that's not necessary in the circumstances of this case, that this court can find, like the Ninth Circuit did, that the querying issue isn't presented on the facts of this case. Because the court's classified record can show, or the court's review of the classified record supports the government's contention that the evidence that was ultimately used at trial in this case wasn't derived from any querying using identities associated with the defendant. The court can review the sequence of events that occurred. Counsel, you said that in your public brief, correct? Yes, we've stated that conclusion. We've stated publicly. But the support for it depends on the court's review of the sequence of events that occurred in the case, from the targeting of the foreign person outside the United States, and the review and discovery of communications that, to which the defendant was a party. And that those, if that sequence of events occurred without the use of queries, then there's no causal relationship between any querying that may have occurred and the use of the Section 702 communications in the applications for was itself came from those traditional FISA orders, and not directly from Section 702. And so the court, based on that review of the chain of events that occurred, can find, not reach the querying issue, but find that the events that occurred here were reasonable in the same way that the Ninth Circuit did in the Mohamud case. So, one thing you said in response to Judge Lucero was that the FISA court had approved the procedures. But why? I'm still a little unclear on why that isn't an advisory opinion. Where's the case or controversy? How can an Article III How can Article III judges do that? It's not an advisory opinion, Your Honor, because the order has real concrete effects. Without the court's issuance of the order, the government is not authorized to conduct the acquisitions. And the result of the FISA order is that binding directives are issued on the communication service providers. And so this is not a case where the court is simply offering a hypothetical advisory opinion. The order has real effects. Could Congress pass a statute that says, henceforth, if an agency promulgates a regulation before it can go into effect, the executive branch can take that to a federal judge and see if it passes muster. And if the judge says no, then it doesn't go into effect. But if the judge says yes, it does. Why would that be any different from what we're dealing with here? Well, I'm not sure that it would be different, Your Honor. Would that be constitutional? Would a statute like that be constitutional? Well, I think it would if the result of the order from the court was then that the regulatory agency could issue binding compulsory process. Where's the adversary proceeding? Where's the case of controversy? What about the example in the reply brief? So TSA asked the federal court to determine the reasonableness of a new airport screening procedure. Are courts allowed to do that? Article III courts. If the result of the procedure were that the agency were then issuing binding process, then that would be, we think, consistent with Article III and consistent with Section 702. All right. I'm not going to belabor this issue too much longer except for one more question. And that is, I'm interested in what you think is the best court analysis of this question that we could look to for guidance and that supports your position. Has any court really I haven't seen extensive analysis. Where are we going to get help in the case law? Well, the Ninth Circuit relatively briefly rejected the Article III challenge that the defendant has raised here. And as did the district court in the underlying the Ninth Circuit's case. And so did another district court in the Northern District of Illinois, a decision cited in our brief called Al-Jayab. I can see that none of those decisions discuss at great length the Article III issues. But if I may just say that the fact that the review takes place at the programmatic level doesn't transgress Article III or take the FISC's review outside of that context because Article III courts are fully capable of conducting facial analysis of statutes or regulations that regulate searches and considering whether they appropriately balance intrusions on individual rights with the government's needs. And the fact that there I am more concerned with traditional Fourth Amendment rights reserved unto the American people that call for Article III review prior to a search, not prior to a search or of a search. And what you're asking us to do, it seems to me, is to bypass that traditional function of the procedural approval granted by another court. Could you cite me some authority that allows us to do that? Well, the authority that we're relying on principally are the other cases that have considered Section 703. You keep asserting the Ninth Circuit case, but if we were to agree with the Second Circuit, and I'm not saying I do, I'm just saying if we were it seems to me that we would ask the trial court below to conduct that review. Or indeed, as I asked Mr. Toomey, perhaps that review has already been conducted in the confidential orders of the trial court, in which case perhaps we may be made privy to those orders so that we can determine the procedural propriety, the Fourth Amendment procedural propriety of the queries made in this case. That's all I'm saying. And perhaps it is already in the record, or perhaps then I certainly, for one, feel like I should know about it and be able to review it. Has it been conducted by Judge Kane already? This has already been done and we're just needlessly having concern that we really don't need to have. I don't think that there is an opinion or a review by the district judge that hasn't been, that the government hasn't clearly described in the classified materials. If I could come back to Your Honor's point about the Second Circuit case. The Second Circuit agreed with the government's general argument as applied to a series of facts in which the targets a foreign person who is an appropriate target of foreign intelligence surveillance. And in that process collects communications as a collateral result that indicate that a U.S. person in contact with that foreign target is potentially acting as an agent of a foreign power and that the government uses those communications in order to obtain orders under traditional FISA provisions. The Second Circuit held that all of that was reasonable. It decided that a remand was necessary principally because in that case there was a conditional guilty plea. And in that circumstance, the Second Circuit was concerned that the defendant's decision whether to plead guilty may have been influenced by what the court called the alternate evidentiary landscape. This case, like the Ninth Circuit case, there was a trial. And we think that on the basis of the classified records here, this court can determine that the evidence that was used in the case wasn't derived from any querying that may have occurred. If the court disagrees and thinks that... I would entirely agree with you that indeed may be the case. My concern is, and my questions go to, the record and what record there is for us to review on that point to determine whether the querying was conducted in accordance with traditional due process Fourth Amendment principles. The government's prepared to meet that burden. Or perhaps it already has done that in the classified record. My preliminary review didn't find that, but indeed it was preliminary. And you might be able to give us some guidance in that regard, which is what I keep probing for. And I realize it's a bit awkward. I'm not trying to probe for classified information in a public setting, but I wish we could have some sense that it's available to us for classified review. Perhaps it's helpful if I say this, Your Honor. I think the government's basis for its argument that the evidence in this case wasn't derived from any querying is set forth in the relevant information in the classified record regarding the government's treatment and use of the information. That material is to the extent that it's available, it's in the declarations that the government submitted in support of its opposition to the to provide additional information and to supplement if the court were to direct us to do that. Maybe you could answer us this. Did Judge Kane go through these procedures? Did he ask these questions? Did he make these determinations? Has that procedural review already been conducted by the trial court? The district court had before it these procedures, and in its public decision contains its analysis of the collection that occurred here. When it determined that it found that on the facts of this case, the collection was narrowly tailored, the district court said, to the government's foreign intelligence purposes. We're not contending that there is additional in the classified record, more specific classified analysis that the district court conducted. Thank you. Counselor, could I ask a question that kind of takes us back up the steps a bit? It concerns the 702 collection based on the targeted non-U.S. person abroad, and the question was posed to both the Second Ninth Circuit whether a warrant should be required, and both courts said no. But I suppose that to the extent that that 702 collection would meet the Fourth Amendment without a warrant, I suppose that one option is to say that no warrant is required, which I understand that's what those courts decided. The other option would be, well, there's an exception to the warrant requirement. I guess there's a no warrant there, too, but I don't know that they relied on an exception. Why isn't the better analysis, from your perspective, from the government's perspective, that an exception to the warrant requirement should be recognized? Well, we don't have any issue with the Supreme Court's Verdugo decision as having described an exception to the warrant requirement that applies when the government targets foreign persons outside the United States. You're saying that the Fourth Amendment doesn't even apply. Is that what you're saying? That's right, and so in a sense, that's an exception to the warrant requirement. There's no warrant requirement that applies as to them. And we've also argued in the alternative, in this case, that there's a foreign intelligence exception to the warrant requirement that also applies in the context of Section 702. The Ninth Circuit and the Second Circuit didn't reach that alternative argument, but the FISC has held that the foreign intelligence exception is fully applicable here, as have some of the district courts that have considered Section 702 in the past. When Congress passed the legislation in 2008, the idea was that the collection would be targeted at a non-U.S. person abroad. Wasn't it understood then, and continues to be understood, that even though that's the targeting, the communications of U.S. persons in the U.S. would be captured? And in light of that, why wouldn't the better Fourth Amendment analysis, again, from your perspective, from the government's perspective, be the foreign intelligence exception to the warrant requirement, instead of simply saying, oh, the Fourth Amendment doesn't apply? Because going into the collection, based on what was known then and what has happened since, all kinds of communications of Americans are being collected. It's true, Your Honor. We don't dispute that Congress understood in enacting the statute that communications of Americans would be a collateral result of collection under Section 702. And as the Second Circuit explained, when the government targets for foreign intelligence purposes, say, hypothetically, a suspected terrorist abroad, the government always has an interest in determining the associates of that foreign intelligence target. And the government's interest is increased rather than decreased when it turns out that those associates might be in the United States. The reason why we think that the exception for targeting non-U.S. persons abroad applies, even in the context of incidental collection, is the incidental collection principle itself, under which, as the Second Circuit and the Ninth Circuit and all the courts that have considered Section 702 to this point have recognized, when the collection is lawful as to the target, then there's no additional warrant requirement that's triggered as to the third parties whose communications are also collected. But the defendant has argued— Mr. Toomey, as Mr. Toomey pointed out, though, the cases that you used to get there involve situations where there was a warrant in place that made the collection lawful in the first place. But we don't have that here. That's true, Your Honor. But as the, again, the Ninth and the Second Circuit and all the cases so far have— Well, I know about the Ninth and the Second. I guess I'm saying, if we're not comfortable with the way they came out on that issue or the way they analyzed the issue, what's our—what is our alternative pathway if we're going to side with you on this case? Is it the warrant intelligence exception? Is that where we'd need to go? That's our alternative argument as to a warrant requirement here, Your Honor. But if I could just briefly speak to the limitation of the incidental collection principle, none of the cases have held that it is necessarily limited to the warrant—to when the government has a warrant. The government needed a warrant in those cases because a warrant was required in the first place. The limiting the principle to only warrants and not warrant exceptions would lead to strange results. For example, Your Honor, consent is an exception to the warrant requirement. And—but if I give consent to the government to see a communication on my phone, it isn't the case that the government would then need a warrant as to the third parties with whom, on the other end of text messages or emails that I choose to share with the government. That's— Assuming that there is an exception or a surveillance exception to the surveillance, to the gathering, to the collection, that's all well and good. The assertion here is that there are billions of data that are collected. Let's say that that's all okay, that that passes constitutional muster and that any collection is inadvertent. That still doesn't address the question or the allegation that hundreds of thousands of times, the FBI, the law enforcement agencies, domestic agencies are querying that data against American citizen information on American citizens in this country. And even that's a broad and very general and interesting question, and I'm sure that we could spend hours talking about the constitutionality of that practice. Again, that's not this case. What we're charged with is to determine whether in this case, against these Americans protected with citizenship status, a Fourth Amendment violation has happened. I don't see how we can say the Foreign Service—Foreign FISA Court can possibly waive Fourth Amendment rights of American citizens. I just don't know. I mean, I'd like to have a case that says that before I went down that path. I don't know of any case that says that law enforcement agencies in the United States can query data obtained legally, can query that data against American citizens residing in the United States. If there is such a case, I need to know about it. Certainly would put my mind at ease, especially if it has SCT behind it. I'm not sure that I can provide an authoritative case law, Your Honor. We're relying on the reasonableness of the minimization procedures, given that the information was lawfully acquired for foreign intelligence purposes. I completely agree with Your Honor that the focus of this court's review should be what the government did with respect to the information in this particular case. The government, in this case, doesn't present the potential issue of what would happen in a domestic criminal investigation in which there's no basis for a foreign intelligence purpose for searching in the Section 702 data. This case was a terrorism case in which the defendant was in contact with the website administrator of a foreign terrorist organization engaged in combat with our forces in Afghanistan. The case was about foreign intelligence from the beginning. And I think when the court reviews what occurred in this case, it should find not only the initial acquisition, but also the steps that the government took leading up to its turning to traditional FISA authority, the authorities that are specifically designed when the government's investigation turns to people in the United States, that all of that was reasonable under the Fourth Amendment. Thank you. Judge, I don't mean to cut off discussion because this is an important case. Judge Iyed, if you have any questions, ultimately patient with us. Judge Nassaroff, can I just ask counsel one question about the speedy trial. We haven't really been talking about it as much in this case. But I'm just going to repeat a question that Judge Lucero put to your counterpart in the previous case. And that is without, I mean, there are a lot of details on the speedy trial issue, but I think we'd really be interested in where this case fits in the speedy trial case law and whether you found examples of where more than six years has elapsed from indictment to trial and the court said there was no speedy trial violation. Just so we're familiar with the legal landscape, and I know you briefed the issue, but what's your best one or two or three examples where something comparable has happened? I mean, we're talking six plus years here. Your Honor, I defer to the answers that were given by co-counsel who focused on the speedy trial issues. I don't know that I can cite to you any specific examples beyond what's in our briefing and what he spoke in response to the earlier argument. You would agree though, wouldn't you, that we're probably at one end of the spectrum? We don't dispute, Your Honor, that the case, it took a long time. And the question, the issue really is whether there were good reasons for that. Okay. Mr. Murphy, did you want to add anything on that point? The only thing I would like to say, Your Honor, Judge Lucero, of course, asked the same question. In our brief, there is such a case. I regret I cannot remember it right now. I think we cited it in our brief. Either way, I will locate that case and I will file it at 28 January. I think it was seven years, as I recall. It's in the briefing. We cited a lot of cases. We'll accept any new cases too. We'll take all the help we can get. I'll look for it. All right. Mr. Toomey, we're ready to hear from you. And we've extended graciously all the time government needed, so you can take additional time if you need it as well. Great. Thank you, Your Honor. I don't know how graciously. I think I have three main points I'd like to just cover in the time that remains. The first is the government's argument that any querying can be carved out of this case. First of all, the government waived that argument. I think the reason that it's been hard for Your Honors to find record evidence, even the classified record, going to any analysis of that question in the government didn't present that argument. But counsel, couldn't we affirm on an alternative ground? Is it really waivered that you're going to rely on here? Well, if the government didn't put in sufficient facts and didn't make the legal arguments that go with those facts for the court to reach that decision, I think it would be improper, not least because the defense had no opportunity to address those arguments below or to investigate or ask for access to any of the facts that bear on that question. And what the government is essentially arguing is that it's evidence that trial was not derived from a particular, in its view, one slice of the ways in which Section 702 information is used. And that would require a poisonous tree analysis that the Supreme Court has said is an incredibly complex task that needs to be adversarial in the first instance. So we think the government didn't raise this argument. And I want to emphasize, at least my impression of why that is. And that's because the government has long argued, including to the FISA Court itself, that the reasonableness of the surveillance depends on the procedures. And the procedures, they deal with many different ways the evidence can be used. Minimization, retention, dissemination, querying. Because all of those uses go to how broadly the government may intrude on an American's privacy, like Mr. Murov's, when his information is swept up in that surveillance. So I just want to say that we believe that's the correct analysis. We've laid out many of these points in the motion to file a supplemental brief that we filed several weeks ago. But the other point I want to emphasize is that even if the queries are put aside, even if the court were to agree with that, regardless of the queries, we believe that surveillance and collection and use of Mr. Murov's communications was unlawful. And to the extent that the court's analysis turns on how agents encountered these communications in the first instance, how they reviewed them, how many of them they reviewed and exploited before filing the application to target Mr. Murov specifically, to the extent that those are facts the court would look to, we have never had access to those. We have never had an opportunity to address how reasonableness would apply to those facts, whether if the government is, again, relying on some type of plain view theory by another name, how that would apply. And I think those facts are relevant for the same reason they were relevant in the hard drive cases like Loera and like Kerry, where the court, it mattered whether the agents have reviewed the information beyond the scope of the warrant for a minute or for five hours. And so the ways in which those facts apply to reasonableness are crucial, and it's crucial for the defense to have a chance to address them. The third point, I think, goes to the consent counterexample that a counsel for the government raised. Now that's an interesting counterexample, but it doesn't apply here because when you have a consent situation, what has happened is that the privacy interest in the communications has been eliminated by virtue of the consent. If there are two parties to a communication, one of them puts that communication online, that communication is public. It's not private anymore, just as if one of the parties chooses to turn it over to the government. So it's not the same analysis as one where here the government is relying on an exception to the warrant requirement based on the fact that its target explicitly in the government's view has no Fourth Amendment rights whatsoever, and then it's turning around and saying, we get a free path essentially to investigate an American's communications for any foreign intelligence or criminal purpose without any consent. So my last point, Your Honor, is that the foreign intelligence exception that the government urges this court to adopt is broader than any foreign intelligence exception that other appellate courts around the country have adopted. In the case of dealing with foreign intelligence exceptions, what the courts have typically looked to is traditional FISA, which doesn't do away with warrant requirement, but instead makes the probable cause showing relate to the target status as a foreign agent. But I want to be clear that no court has ever said that simply because the government is pursuing what it calls foreign intelligence, and that's defined very, very broadly under FISA in Section 1801, that simply because the government is pursuing something that it calls foreign intelligence. So it's bedrock, papers, and effects. Thank you, Your Honor. Counselor, excused. I want to thank counsel on behalf of the panel for your assistance in this case. Mr. Murphy, Mr. Palmer, Mr. Tuohy, you've done a very superb job. Counsel in the previous case did as well. Thank you all. The case is submitted. Counselor, excused.